UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
CARL VALLEJO,

                     Plaintiff,            MEMORANDUM & ORDER
                                        07-CV-2991(JS)
       -against-

FOUR SEASONS SOLAR PRODUCTS, INC.,

                     Defendant.
----------------------------------X
APPEARANCES:
For Plaintiffs:      Carl Vallejo, pro se
                    1824 Julia Goldbach Avenue
                    Ronkonkoma, NY 11779

For Defendant:       John K. Diviney, Esq.
                    Max Saulter Gershenoff, Esq.
                    Rivkin Radler LLP
                    926 RXR Plaza
                    Uniondale, NY 11556

SEYBERT, District Judge:

       Pending before the Court is a motion for summary judgment filed by Four Seasons Solar Products, Inc. ("Defendant" or "Four Seasons") against pro se plaintiff Carl Vallejo ("Plaintiff" or "Vallejo") pursuant to Fed. R. Civ. P. 56 (Docket Entry 75). For the reasons set forth below, Defendant's motion for summary judgment is GRANTED.

BACKGROUND

       Four Seasons manufactures and sells sunrooms[1] through company-owned retail stores and franchise outlets. In January

---

[1] Sunrooms--sometimes known as conservatories--are structures usually built onto the side of a home that allow its inhabitants to enjoy the surrounding landscape even as they are sheltered from the adverse elements outdoors.

2003, Jacob "Jack" Chapman, Sales Manager for Four Seasons' retail store in Holbrook, New York, hired Plaintiff as a Design Consultant for the Holbrook store. Defendant's Rule 56.1 Statement ("Def.'s Stmt"), ¶ 5. ("Design Consultant" is Defendant's term for a salesperson employed at a retail store.)

The Design Consultants' primary function was to sell sunrooms to customers whose contact information was distributed to the Design Consultants, who were then expected to meet with the prospective customers at their homes. Def.'s Stmt, ¶ 8. Accordingly, to maximize Four Seasons' marketing efforts, the Design Consultants were also expected to be available to attend customer meetings in the evenings and on weekends, the to better accommodate customers' schedules. Id. ¶ 9.

Compensation for the Design Consultants essentially had two phases. First, when a customer signed a sales contract, the Design Consultants received an initial commission. Then, as the sunrooms were completed and after the customers tendered payments, the Design Consultants were paid a second time. Id. ¶ 10.

To rationalize and streamline customer home visits in 2003 and 2004, Four Seasons began requiring Design Consultants to submit written availability sheets stating the days on which they could make home visits, id. ¶ 14, and to be available to work five days each week. Id. ¶ 16. Furthermore, Design Consultants would also be required to request their vacation time in writing at least

two weeks in advance.  These new rules were vital to Four Seasons' effort to meet its customer visiting obligations.  Id. ¶ 20.

Despite these new rules, however, Four Seasons testifies that it permitted Plaintiff, who alleges that he is a member of the church of Jehovah's Witnesses, to take off two evenings per week or Sundays, so that Plaintiff could participate in church activities. Id. ¶ 21.  In spite of the leniency shown to Plaintiff by Four Seasons, Plaintiff failed on a number of occasions to comply with the company's vacation policy.  During 2004, for example, Plaintiff took off 18 days for vacation, four days over the limit.  Id. ¶ 25(i).

For his part, Plaintiff alleges that in April 2004, "Jack Chapman (Atheist), Sales Manager, and Joseph Ronzino (Christian), General Manager, told me that my attending religious meetings two nights a week and on Sunday was a problem."  Pl.'s Compl. p. 7.

Without providing the requisite 14-day notice, Plaintiff advised Jack Chapman that he would take off September 11, 2004 failing to mention, according to Defendant, that this was to observe a religious requirement.  Id. ¶ 27.  Citing the notice rule, Chapman refused to allow Plaintiff a vacation day, prompting Plaintiff to announce that he would take off that day just the same.  In response, Chapman suspended Plaintiff's "leads" (customer contact information) for 10 days.  Id. ¶ 28.  Plaintiff alleges that, in reality, he was suspended for attending a religious event

and that Chapman requested a letter from Plaintiff's congregation verifying "[his] religious participation."  Pl.'s Compl. p. 7.

A couple of weeks later, on September 30, 2004, Four Seasons received a letter from the East Congregation of Jehovah's Witnesses in Central Islip, New York, which, while confirming that Plaintiff was a member of the church, made no mention of September 11, 2004 or of why Plaintiff would need to be absent on that day. Def.'s Stmt, ¶ 31.

Then, the Defendant started receiving complaints about Plaintiff's policy violations.  On January 31, 2005, without the requisite 14-day notice, Plaintiff advised Four Seasons that he would take the next week off so that he could attend a real estate investment training course (which is not a practice associated with the church of Jehovah's Witnesses).  Id. ¶ 32.  In the face of warnings that such a decision could cost him his job, Plaintiff took the vacation time without authorization.  Id. ¶ 35.  At this point, Plaintiff absented himself from work for four months.  Id. ¶ 36.  More specifically, between February 2005 and June 2005, Plaintiff neglected to attend staff meetings, failed to submit any availability sheets, and did not ask to be listed as available to handle leads.  Id. ¶ 38.  Meanwhile, Plaintiff alleges that Four Seasons' decision not to provide him with sales appointments in this period was based on religious discrimination.  Pl.'s Compl. p. 7.

In an effort to seek a rapprochement with Plaintiff in spite of his extended absence, Joseph Ronzino, General Manager of the Holbrook store, met with Plaintiff and offered to let him cover a few leads. Def.'s Stmt, ¶ 41. Ronzino made good on his offer by directing Michele Zezima, Four Seasons' Events Coordinator, to provide Plaintiff with some leads. Upon exhausting the leads, Plaintiff called Jack Chapman with a request for more. Chapman replied: "When are you coming back full time?" Id. ¶ 44. Plaintiff neither responded to this, nor to Chapman's follow-up e-mail message posing the same question. Id. ¶ 46.

After having received no response from Plaintiff for three to four months (during which time Defendant continued to cover Plaintiff's health insurance), Defendant ultimately concluded--in October 2005--that Plaintiff had abandoned his employment as a Design Consultant. Defendant then sent Plaintiff a letter dated October 27, 2005 officially terminating his employment. Id. ¶ 54. For his part, Plaintiff alleges that Four Seasons' failure to provide him with sales appointments between July 2005 and October 27, 2005 was attributable to discriminatory animus and that his termination was a result of the same. Pl.'s Compl. p. 8.

After having his employment terminated with Defendant, Plaintiff's attempts to develop new employment opportunities were patchy and unsuccessful. In December 2005, for instance, he

organized a business called "Fitness by the Minute LLC". Id. ¶ 57. Fitness by the Minute, however, did no business in either 2005 or 2006. Id. Further, Plaintiff concedes that he did not actually apply for any positions in 2006. Id. ¶ 59. In 2007, Plaintiff managed to secure a few odd jobs, including positions with a contractor, a landscaper, and an electrical company, but did not hold them for long. Id. ¶ 61. At length, Plaintiff took a job as a personal trainer with the health club Bally Total Fitness Corp. where his employment was terminated less than a year later. Id. ¶ 65. All told, Plaintiff's earned income in 2007 amounted to less than $20,000.00 and in 2008 it was less than $14,000.00. Id. ¶¶ 64, 66. Plaintiff made no effort to secure regular employment in 2008 after his dismissal from Bally's.

On April 20, 2006, Plaintiff filed an administrative complaint with the New York Division of Human Rights ("DHR") charging Defendant with unlawful discriminatory practice in violation of the New York State Human Rights Law. The DHR subsequently dismissed this complaint for want of probable cause. Id. ¶¶ 73, 74. On July 23, 2007, Plaintiff filed his complaint in this case. It offers three discrete claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. ("Title VII") and New York State Human Rights Law, N.Y. Exec. Law § 296 ("NYSHRL"): (1) disparate treatment; (2) failure to accommodate; and (3)retaliation.

Before proceeding to the merits of Defendant's motion, it is worthwhile to review the extraordinary lengths to which the Court has gone to accommodate this pro se Plaintiff in the prosecution of his case. Defendant filed and served the motion sub judice more than six months ago on August 27, 2010. See Docket Entries 75-82. On November 2, 2010, nearly two weeks after Plaintiff's opposition was due, Plaintiff moved for a three-month extension of time--that is, until January 19, 2011. See Docket Entry 83. By Order dated November 5, 2010, the Court granted Plaintiff until December 6, 2010 but permitted him to renew his request to extend time to January 1, 2011 for good cause shown.

On November 12, 2010, Plaintiff renewed his request for the January 19, 2011 deadline. See Docket Entry 84. This the Court granted by Order dated November 17, 2010.

On January 19, 2011 Plaintiff filed a third motion for an extension of time. See Docket Entries 85, 87. And again the Court granted Plaintiff's request, setting a new deadline of February 11, 2011. This time, however, the Court admonished Plaintiff that "NO FURTHER EXTENSIONS WILL BE GRANTED." See Docket Entry 88. Notwithstanding the categorical language of that Order, on February 1, 2011, Plaintiff made a fourth request for an extension, seeking a March 1, 2011 due date. By Order dated February 3, 2011, the Court denied the motion, commenting that "Plaintiff has received repeated extensions of time to file his opposition to

Defendant's motion for summary judgment, which was filed more than five months ago. Plaintiff's latest request cites neither good cause for another extension nor an explanation why five months was insufficient to prepare a response." See Docket Entry 90.

Undeterred, on February 10, 2011, Plaintiff filed his fifth motion for an extension, now seeking a March 4, 2011 deadline. See Docket Entry 91. Bending over backwards and despite its previous Order, the Court granted Plaintiff's request, giving him a last minute reprieve until February 14, 2011, so that he could finish work on his opposition over the weekend. In the Order, dated February 10, 2011, the Court noted that there would be "no further extensions."

On February 14, 2011, Plaintiff finally submitted his opposition on which Defendant relied in crafting and submitting its reply. Yet ten days after Defendant filed its reply, Plaintiff filed a second, 75-page set of opposition papers, prompting a letter motion to strike from Defendant. See Docket Entries 96, 97.

Mindful of the allowances that are afforded a pro se litigant, the Court cannot simply nevertheless ignore Defendant's significant expenses in time and money that went into the creation of its reply papers. Defendant is entitled to rely on the orders of this Court which have repeatedly held that no further extensions and allowances would be made to Plaintiff in the briefing schedule. Therefore, Defendant's motion to strike (Docket Entry 97) is

GRANTED.  In its resolution of Defendant's motion, the Court will not consider the much-belated 75-page supplementary opposition papers submitted by Plaintiff on March 4, 2011.  See Hamlett v. Srivastava, 496 F. Supp. 2d 325, 328 (S.D.N.Y. 2007) (latitude afforded pro se litigant did not "excuse him from meeting deadlines imposed by the Court to file opposition.")

DISCUSSION

I.   Rule 56 Standard of Review

A district court may properly grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).

"In assessing the record to determine whether there is a genuine issue to be tried . . . the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).  What is more, where, as here, the party against whom summary judgment is sought is a pro se litigant, an additional layer of "special solicitude"

is bestowed on that party.  Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

Nevertheless, mere conclusory allegations, speculation or conjecture will not avail a party opposing summary judgment, see Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996), and "[f]actual disputes that are irrelevant or unnecessary will not be counted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986) (citing 10A Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2725, at 93-95 (1983)).

Rule 56 places the initial burden on the moving party to demonstrate that there are no material facts in dispute and that it is entitled to judgment as a matter of law.  If and when that burden is satisfied, the burden of production shifts to the non-moving party, who may survive summary judgment only by showing that there is indeed a "genuine" issue of material fact to be decided.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  The moving party's initial burden may be discharged with a showing that there is "an absence of evidence to support the non-moving party's case."  Celotex Corp., 477 U.S. at 325.

II.  Plaintiff's State Law Claims

Plaintiff alleges discrimination pursuant to New York State Human Rights Law, N.Y. Exec. Law § 296 ("NYSHRL").  Under Section 297(9), when a plaintiff elects an administrative forum by

10

filing a complaint with the New York Division of Human Rights ("DHR"), and when the DHR dismisses that complaint for want of probable cause, courts are subsequently stripped of jurisdiction to entertain state law claims based on allegations contained in the administrative complaint. <u>See</u> <u>Stout v. International Business Machines Corp.</u>, 798 F. Supp. 998, 1007-09 (S.D.N.Y. 1992) (citing <u>Promisel v. First American Artificial Flowers, Inc.</u>, 943 F.2d 251, 257 (2d Cir. 1991); <u>see</u> <u>also</u> N.Y. Exec. Law § 297(9).

Here, Plaintiff does not dispute Four Seasons' statement of fact that the DHR dismissed his administrative complaint for lack of probable cause. <u>See</u> Def.'s Stmt, ¶¶ 73-74; <u>see</u> <u>also</u> Pl.'s Stmt. ¶ 72 <u>et</u> <u>seq.</u> Additionally, together with its reply papers, Defendant submits documentation from the DHR confirming this dismissal. <u>See</u> Declaration of Max Gershenoff, Ex. A, p. 13.

Because it is undisputed that Plaintiff's administrative complaint was dismissed as being without probable cause, Plaintiff's state law claims here, based on the same allegations as those rejected by the DHR, must be dismissed on summary judgment.

Accordingly, Defendant's motion is GRANTED insofar as these claims are concerned.

III. <u>Plaintiff's Title VII Claims</u>

    A.   <u>The Summary Judgment Standards</u>

With respect to Plaintiff's disparate treatment and retaliation theories, the Court will analyze his discrimination

11

claims under the standard burden-shifting framework established in
McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36
L. Ed. 2d 668 (1973).  This means that to overcome Four Seasons'
motion for summary judgment Plaintiff must establish a prima facie
case of discrimination or retaliation.  See Gonzalez v. N.Y. City
Transit Auth., 2008 U.S. Dist. LEXIS 27605 at *18-21 (E.D.N.Y.
2008).

To establish a prima facie case of discrimination,
Plaintiff must show by a preponderance of the evidence that: (1) he
was a member of a protected class at the relevant time; (2) he was
qualified for his employment; (3) he suffered an adverse employment
action; and (4) the adverse action occurred under circumstances
giving rise to an inference of discrimination.  Id.

To establish a prima facie case of retaliation,
meanwhile, Plaintiff must show that: (1) he was engaged in a
protected activity; (2) Defendant was aware of that activity; (3)
he suffered an adverse action; and, (4) there was a causal
connection between the protected activity and the adverse action.
See, e.g., Wang v. State Univ. of N.Y., 470 F. Supp. 2d 178, 185
(E.D.N.Y. 2006).

Should Plaintiff clear these initial hurdles, the burden
shifts to Defendant to articulate a nondiscriminatory business
rationale for its actions.  If Defendant's efforts meet with
success, the burden shifts again to Plaintiff to demonstrate that

12

Defendant's explanations are mere pretext for discrimination. <u>See</u> <u>Slattery v. Swiss Reinsurance Am. Corp.</u>, 248 F.3d 87 (2d Cir. 2001).

With respect to Plaintiff's failure-to-accommodate claim, he must show that: (1) he held a bona fide religious belief that conflicted with an employment requirement; (2) he informed Defendant of the belief; and, (3) he suffered an adverse employment action for failure to comply with the employment requirement at odds with his belief. <u>See</u>, <u>e.g.</u>, <u>Siddiqi v. New York City Health & Hospitals Corp.</u>, 572 F. Supp. 2d 353, 369 (S.D.N.Y. 2008). If and when the plaintiff establishes a <u>prima</u> <u>facie</u> case, the burden shifts to the defendant to show that it could not reasonably accommodate the Plaintiff without undue hardship on its business. <u>Id.</u> Such "reasonable accommodation" does not require that the employer accept the accommodation that the employee prefers; "[i]nstead, when any reasonable accommodation is provided, the statutory inquiry ends." <u>EEOC v. Delta Airlines, Inc.</u>, 2002 U.S. Dist. LEXIS 17259 at *11 (E.D.N.Y. 2002).

B.    <u>Statutory Time Period Problems</u>

For all of the Title VII claims alleged in the Complaint, Plaintiff was required to file discrimination charges with the United States Equal Employment Opportunity Commission ("EEOC") within 300 days of the alleged discrimination or retaliation. <u>See</u> 42 U.S.C. § 2000e-5(e)(1). In New York, thanks to a work-sharing

agreement between the EEOC and DHR, the latter serves as an EEOC agent for the receipt of charges. <u>Favia v. New York City Bd. of Educ.</u>, 2000 U.S. Dist. LEXIS 12397 at *6-7 (S.D.N.Y. 2000).

"When a plaintiff's allegations of discrimination extend beyond the 300-day limitations period, the nature of the claim determines what consideration will be given to the earlier conduct." <u>Petrosino v. Bell Atl.</u>, 385 F.3d 210, 220 (2d Cir. 2004). With respect to claims based on termination, denial of transfer, refusal to hire, or failure to promote, for example, section 2000e-5(e)(1) bars recovery for discrete acts of discrimination or retaliation occurring outside the statutory time period. <u>Patterson v. County of Oneida, N.Y.</u>, 375 F.3d 206, 220 (2d Cir. 2004). Hostile work environment claims, on the other hand, are qualitatively different from discrete acts and therefore "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." <u>National Railroad Passenger Corporation v. Morgan</u>, 536 U.S. 101, 105 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002). Separately, under the so-called "continuing violation exception" to the 300-day statutory period, "if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of

discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." <u>Lambert v. Genesee Hospital</u>, 10 F.3d 46, 53 (2d Cir. 1993), <u>cert. denied</u>, 511 U.S. 1052, 114 S. Ct. 1612, 128 L. Ed. 2d 339 (1994). It need hardly be added that to satisfy this exception Plaintiff must at the very least allege an ongoing <u>policy</u> of discrimination. <u>Id.</u>

Here, Plaintiff filed his DHR complaint, comprising all of the allegations found in the instant Complaint, on April 20, 2006. <u>See</u> Pl.'s Compl. p. 7. On his Title VII <u>pro se</u> checklist, Plaintiff has indicated that his three claims are for termination of employment, retaliation, and failure to give religious accommodation. <u>Id.</u> He does not allege a hostile work environment. Nor does he allege a continuous policy of discrimination. <u>Id.</u> Unlike a hostile work environment claim, whose "very nature involves repeated conduct", <u>Morgan</u>, 536 U.S. at 115, the unlawful employment practices of which Plaintiff complains <u>can</u> be said to have occurred on particular days. For this reason, Plaintiff cannot recover for discrete acts of discrimination or retaliation that transpired prior to June 24, 2005 (that is, 300 days prior to April 20, 2006).

Yet a substantial amount of the activity in Plaintiff's Complaint occurred prior to the magic date of June 24, 2005, that (1) the alleged comment in April 2004 by Jack Chapman and Joseph

Ronzino that Plaintiff's attending Jehovah's Witness gatherings two nights a week and on Sundays was "a problem"; (2) the allegation that Plaintiff's suspension in September 2004 was prompted by Plaintiff's decision to attend a religious meeting; (3) Jack Chapman's alleged demand that Plaintiff produce a letter from his church confirming his membership; and, (4) the Defendant's alleged failure to provide Plaintiff with any sales appointments between February 2005 and June 2005 because of his religious affiliation. See Pl.'s Compl. p. 7.

Accordingly, Plaintiff may not recover for any of the above actions, these aspects of the Complaint being time-barred. See, e.g., Patterson v. County of Oneida, 375 F.3d 206, 220-221 (2d Cir. 2004). Defendant's motion is therefore GRANTED insofar as these particular allegations are concerned.[2]

C.   Plaintiff's Disparate Treatment Claim

With his time-barred claims dismissed, the only remaining allegations of unlawful discriminatory acts are that Defendant failed to provide Plaintiff with sales appointments between July 2005 and October 27, 2005 and that his employment was terminated on October 27, 2005 because of discriminatory animus. See Pl.'s Compl. p. 7.

---

[2] Importantly, the conclusion that Plaintiff may not recover for the discrete incidents and comments enumerated above does not mean that these may not be considered as evidence supporting a claim which does satisfy the 300-day statutory rule.

For both of these, in order for Plaintiff to make out a prima facie case, he must establish that he was qualified for his Design Consultant position. In this connection, it is important to note that "[e]xcessive absenteeism has been repeatedly cited by courts as evidence of lack of satisfactory job performance." Perez v. Communications Workers of America Local 1109, No. 03-CV-3740, 2005 WL 2149204, at *9 (E.D.N.Y. Sept. 6, 2005) (quoting Hendrics v. National Cleaning Contractors, Inc., No. 95-CV-5240, 1998 WL 26188, at *3 (S.D.N.Y. Jan. 26, 1998)).

Here, it is undisputed that (1) by 2005 Defendant enacted a policy requiring Design Consultants to be available to work five days a week with a minimum of 40 hours per week and to submit written availability sheets indicating the days on which they could cover sales appointments, Pl.'s Stmt. ¶¶ 12-16; (2) in February 2005, Plaintiff left work for a week to attend a real estate training seminar (which was unrelated to his religious practices) without giving the requisite two-week notice and after having received fair warning that there might be sharp employment consequences, Pl.'s Stmt. ¶¶ 32-35; and, (3) between late February 2005 and June 2005 Plaintiff neither submitted available sheets nor written requests asking to be given sales calls, nor visited Defendant's offices, nor contacted Defendant in any manner, Pl.'s Stmt, ¶¶ 32-37.

While it is true that where, as here, "the employer has

17

already hired the employee, the inference of minimal qualification is not difficult to draw," Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 92 (2d Cir. 2001), the Court would be remiss if it overlooked Plaintiff's four-month absence from work. And Plaintiff does not satisfy this element of his prima facie case by conclusively stating that "Plaintiff never abandoned his position. It was Four Seasons management who abandoned Plaintiff." Pl.'s Stmt. ¶ 36. Nor is his extended disappearance from work adequately explained or justified by Joseph Ronzino's alleged failure to return a single message on his cell phone's answering machine or by the latter's "Atheistic or Non belief in God." Id.

Accordingly, the Court concludes that Plaintiff has failed to establish this element of his prima facie case of disparate treatment.

Even if this Court were to find that Plaintiff was qualified for his position as a Design Consultant, however, he has not met his burden of establishing an inference of discrimination. To succeed in this, Plaintiff must show "circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997). Simply put, during the actionable period of Plaintiff's complaint--i.e., June 24, 2005 and thereafter-- Plaintiff offers not even the faintest evidence whatsoever supporting an inference of discrimination based on his religious

beliefs, much less circumstances that would be sufficient to permit a rational finder of fact to infer such a discriminatory motive. As for the allegation that in April 2004 Jack Chapman and Joseph Ronzino "told [Plaintiff] that [his] attending religious meetings two nights a week and on Sunday was a problem", Pl.'s Compl. p. 7, it is hardly sufficient on its own to permit a rational inference of discrimination based on religious affiliation: Plaintiff offers no proof that it was his religion per se that was "the problem" and not merely Plaintiff's unavailability.  Put another way, Plaintiff has not offered evidence foreclosing the possibility–indeed, the likelihood--that Defendant equally would have found a "problem" with Plaintiff's absences caused by such decidedly secular matters as horseback riding, a bridge club membership, or plain indolence.

Although it is undisputed that in June 2005 Defendant provided Plaintiff with several leads and told him to no avail to contact Michele Zezima, Defendant's Events Coordinator, for additional ones, Plaintiff's arguments exclusively center on the quality of these leads (and are based, moreover, on his ipse dixit alone).  But even if it were true that the leads he received in June 2005 were sub-par, this evidence in isolation is not sufficient to make out a prima facie case.

Furthermore, it is undisputed that when Defendant's Sales Manager Jack Chapman asked Plaintiff in June or July 2005 when he was coming back to work full time, Plaintiff failed to give a

<u>direct response to this simple inquiry</u>. Pl.'s Stmt. ¶¶ 44-45. For all of Plaintiff's zigzagging narration about who called whom and when, he curiously fails to deny this--and other--basic statements of fact. For example, in response to Defendant's statement of fact that Jack Chapman sent an e-mail to Plaintiff in September 2005 requesting that Plaintiff come in for a meeting to discuss his future with Defendant and that Plaintiff never replied, Plaintiff "admits in part and denies in part" (a formulation he uses with virtually every statement of fact) with the explanation that he "rarely if ever used e-mail." Pl.'s Stmt. ¶ 46. Yet he inconsistently follows this up with a reference in the very next sentence to an e-mail he <u>did</u> receive from Defendant's Events Coordinator in July 2005. <u>Id.</u> Finally, he admits that he received the Chapman September 2005 e-mail but not "until after he received his termination letter over a month later." <u>Id.</u>

Similarly, in response to Defendant's statement of fact that by a letter dated October 27, 2005, Defendant informed Plaintiff that his employment was terminated because (a) he had not covered a lead since July 2005, (b) he had not been in contact with Zezima to seek leads, and, (c) it appeared as though he elected to pursue business elsewhere, Plaintiff "admits in part and denies in part" that it was "[Defendant] that cut off Plaintiff from leads, [it was] Zezima [who] no longer contacted Plaintiff." <u>Id.</u> at 54. Cutting to the gravamen of his claim, Plaintiff adds that

"it was by [Defendant's] own fabrication as a
pretext to make it appear that Plaintiff had
decided to pursue other businesses because
they did not confer with Plaintiff before
making this decision. By design, contrivance,
and manipulation was each step of the process
calculated for the sole purpose of covering up
the hostilities and retaliation and
discrimination perpetrated against Plaintiff."

Id. But the evidence adduced in support of this theory of

conspiratorial discrimination is nothing more than the Plaintiff's

say so. Only his own affidavit is cited. Id.

Accordingly, since Plaintiff has not come forward with

circumstances that would be sufficient to permit a rational finder

of fact to infer such a discriminatory motive, he has failed to

establish a prima facie case.

In any event, even if Plaintiff had met his initial

burden under the McDonnell-Douglas burden-shifting framework, the

Court is satisfied that Defendant has articulated legitimate, non-

discriminatory reasons for its actions. First, the Plaintiff not

having offered any evidence allowing an inference of

discrimination, it would be difficult indeed for the Court to find

that Defendant hasn't offered non-discriminatory reasons for its

actions. The fact is that Plaintiff's lack of sales appointments

between July and October 2005 and his ultimate termination are

completely consistent with the facts which Plaintiff has not

adequately denied: (1) he left his job without prior approval to

attend a real estate training seminar; (2) he abandoned the

workplace for an extended period of time; and, (3) he neglected to respond to simple requests regarding whether he would come back to work full time. And having concluded that Plaintiff has not offered evidence of discrimination, the Court can hardly find that Plaintiff satisfies his burden of showing that these non-discriminatory explanations are pretextual.

D.  Plaintiff's Retaliation Claim

Although Plaintiff does not seem to pursue his retaliation claim in his papers, he has checked the retaliation box in his pro se Complaint and it must therefore be addressed.

The claim must fail for at least two reasons. For one thing, Plaintiff's Complaint does not allege that Plaintiff ever engaged in protected activity. For another, Plaintiff's DHR complaint does not contain a claim for retaliation. See Pl.'s Compl. p. 7. Nor is it readily apparent from the DHR complaint's factual allegations that an inquiry into unlawful retaliation would fall within the scope of the DHR's investigation into the complaint. Therefore, having failed to exhaust his administrative remedies with respect to the claim, Plaintiff may not bring it here in the first instance and the claim must be dismissed on summary judgment. See Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 177 (2d Cir. 2005) ("claims that were not asserted before the EEOC [or an appropriate State or local agency] may be pursued in a subsequent federal court action [only] if they are reasonably

related to those that were filed with the agency").

     E.    <u>Plaintiff's Failure to Accommodate Claim</u>

          1.   <u>Time Bar</u>

Plaintiff's allegations relating to a failure to accommodate are limited to the following: (1) Chapman's and Ronzino's alleged comments in April 2004 that Plaintiff's attendance at a Jehovah's Witness meeting two nights a week and on Sundays was "a problem"; (2) Plaintiff's suspension in September 2004, allegedly as a result of his attending a religious event; (3) Plaintiff's failure to receive sales leads between February and June 2005; and, finally, (4) Plaintiff's failure to receive such leads between July and October 2005 and his termination on October 27, 2005.

As decided above, the first three of these allegations run afoul of the 300-day statutory time bar. <u>See</u> <u>supra</u> Section III, B. As for item (4), Plaintiff's failure to receive such leads between July and October 2005 and his termination on October 27, 2005, Plaintiff has failed to produce any evidence linking his lack of sales, or his termination, to employment requirements that conflicted with his Jehovah's Witness faith. Yet to prevail on a failure-to-accommodate claim, Plaintiff must make this showing. <u>See</u>, <u>e.g.</u>, <u>Siddiqi v. New York City Health & Hospitals Corp.</u>, 572 F. Supp. 2d 353, 369 (S.D.N.Y. 2008). Indeed, so far from making this showing, Plaintiff concedes that he never contacted Events

Coordinator Zezima to pursue further sales, Def.'s Stmt, ¶¶ 40-43, and pointedly does not assert that this was because of a religious belief. Nor does Plaintiff allege that his failure to reply to Chapman's question as to whether Plaintiff planned on returning to work full-time was a result of a religious conviction. More to the point, nor does he aver that his extended, months-long absence from work had anything to do with the tenets of the Jehovah's Witness faith.

For these reasons and others, genuine disputes of material fact simply do not emerge from the record and Defendant is entitled to summary judgment on Plaintiff's failure-to-accommodate claim.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment (Docket Entry 75) and its motion to strike Plaintiff's sur-reply (Docket Entry 97) are GRANTED. The Clerk of the Court is instructed to mail Plaintiff a copy of this Order and to mark this case CLOSED.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    March __28__, 2011
          Central Islip, New York